NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>   v.<br><br>EDWIN RIVERA,<br><br>                    Defendant. | Crim. No. 23-524 (GC)<br><br>OPINION |

**CASTNER, District Judge**

This matter comes before the Court upon Defendant Edwin Rivera's Motion to Suppress all evidence stemming from the Government's search of Rivera's vehicle that occurred on February 8, 2023. (ECF No. 30.) The Government opposed. (ECF No. 32.) The Court held a suppression hearing on September 17, 2024, after which the parties filed supplemental briefs. (ECF Nos. 53, 57-59.) The Court has carefully considered the parties' submissions. For the reasons set forth below, and other good cause shown, Rivera's Motion to Suppress is **DENIED**.

**I.    BACKGROUND**

    **A.    Factual Background**

Since early 2021, agents with the Drug Enforcement Administration (DEA) and Homeland Security Investigations (HSI) have jointly investigated a drug trafficking and money laundering organization involving a narcotics courier referred to as "Diddy" in text message exchanges

between the alleged co-conspirators. (Suppression Hearing Transcript (Tr.) 6:7-24.[1]) DEA Agent Matthew Figueira reviewed text messages between the co-conspirators and "Diddy" that had been retrieved pursuant to a border search of one of the co-conspirator's cell phones. (ECF No. 30-1 at 5.) Agent Figueira determined, through subscriber information and open-source and law enforcement databases, that "Diddy's" phone number was associated with Rivera. (Tr. 7:3-8:6.) Law enforcement was also informed that "Diddy" used a Honda Pilot bearing New York license plate number JFR 5961, which contained a hidden compartment known as a "trap" to transport narcotics. (*Id.* 8:7-10:11.) Law enforcement also confirmed through open-source and law enforcement databases that the Honda Pilot was registered to a New York residential address associated with Rivera. (*Id.*) Law enforcement further learned that "Diddy" typically received narcotics and the proceeds of their sale at an apartment building located at 125 Passaic Avenue in Kearny, New Jersey. (*Id.* 8:25-9:5.)

On December 19, 2022, Agent Figueira was conducting surveillance of the apartment building at 125 Passaic Avenue and observed Rivera arrive driving a Honda Pilot bearing New York license plate number JFR 5961. (*Id.* 11:10-15:16.) He observed Rivera park in the building's parking lot, enter the building with a duffle bag, and exit with a bag that appeared to be slightly heavier. (*Id.*) Agent Figueira and another task force officer attempted to follow Rivera, but because Rivera was "driving erratically" and using "countersurveillance techniques," they eventually lost sight of him. (*Id.*) On December 28, 2022, law enforcement observed Rivera driving the same Honda Pilot for a second time at a different location. (*Id.* 15:18-16:9.)

---

[1] Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties. The Suppression Hearing Transcript may be found at ECF No. 53.

On February 8, 2023, Agent Figueira was again conducting surveillance at 125 Passaic Avenue with another law enforcement officer, DEA Task Force Officer (TFO) Astulquilca. (*Id.* 17:2-18:25.) They observed Rivera drive into the parking lot in the same Honda Pilot. (*Id.*) At 8:01 p.m., Rivera entered the apartment building carrying a black duffel bag. (*Id.* 18:6-19:6; Gov. Ex. 2 at 19:59:50.[2]) Approximately twenty minutes later, Rivera left the building carrying the same bag, which Agent Figueira believed appeared to be heavier. (Tr. 21:9-22:16; Gov. Ex. 2 at 20:17:25.) Agent Figueira also believed that Rivera's gait changed because the bag was heavier, and that Rivera appeared "more cautious, looking around, trying to get back as soon as he could to his car." (Tr. 22:2-16.)

Because law enforcement's previous attempt to surveil Rivera with only two agents was unsuccessful, Agent Figueira called Special Agent Ragolia, HSI, to request additional officers to assist. (*Id.* 26:10-20.) Special Agent Ragolia directed TFO Kevin Wronski to head to 125 Passaic Avenue "to assist with surveillance," and instructed him that if he observed "a motor vehicle violation, to conduct a motor vehicle stop." (*Id.* 73:23-75:1.) TFO Wronski arrived on scene and parked his vehicle on the opposite side of Passaic Avenue, directly facing the intersection of the parking lot's side street with Passaic Avenue. (*Id.* 75:5-77:13; Gov. Exs. 7 & 8.)

When Rivera returned to his vehicle, law enforcement observed him move around in the vehicle and turn its interior light on and off. (Tr. 26:6-9.) Rivera drove out of the parking lot and approached the stop sign at the intersection of the side street and Passaic Avenue, across from TFO Wronski's position. (*Id.* 77:14-78:1.) Rivera failed to completely stop at the stop sign and made a right turn onto Passaic Avenue without using a turn signal. (*Id.*) TFO Wronski began following

---

[2] The Court refers to the timestamp viewable in the upper left corner of the video recording admitted into evidence as Government Exhibit 2 in the Suppression Hearing.

Rivera, and Agent Figueira followed Wronski. (*Id.* 27:9-12, 78:4-7.) As they followed Rivera, TFO Wronski informed Agent Figueira over the phone that he had observed traffic violations. (*Id.* 27:13-28:5, 78:5-79:4.) TFO Wronski activated his vehicle's overhead lights and initiated a traffic stop. (*Id.*)

After Rivera pulled over, Agent Figueira approached the driver's side of Rivera's vehicle, and TFO Wronski approached the passenger's side. (*Id.* 28:6-28:19.) Both officers smelled burnt marijuana emanating from the vehicle's open windows. (*Id.* 28:6-28:19, 79:13-22.) As Agent Figueira spoke with Rivera, TFO Wronski noticed a rectangular package wrapped in clear plastic sitting on top of a black duffle bag on the front passenger seat. (*Id.* 80:10-16.) TFO Wronski gestured towards Agent Figueira to get his attention and pointed towards the package. (*Id.* 30:2-6, 80:17-81:1.) Agent Figueira also saw the package. (*Id.*) Based on their training and experience, both officers suspected that the package contained narcotics.[3] (*Id.* 30:7-17, 80:10-16.)

Agent Figueira directed Rivera to exit the vehicle, and Rivera complied. (*Id.* 31:6.) Agent Figueira asked Rivera what the package was, and Rivera responded that "it was just marijuana." (*Id.* 31:13-25.) Agent Figueira asked for consent to search the vehicle, and Rivera responded that they could search the vehicle but were "not going to find anything." (*Id.*) Rivera, however, refused to sign a written consent form. (*Id.* 31:24-32:2.) After the officers retrieved the package, Rivera refused to talk any further. (*Id.* 32:16-17.) Neither Agent Figueira nor TFO Wronski wore body cameras during the encounter. (*Id.* 38:1-14, 82:4-22.)

---

[3]    Agent Figueira has worked for the DEA for eight years. (Tr. 5:8-15.) TFO Wronski has worked for the Rahway Police Department for nineteen years, with six years of experience in a narcotics unit, and is currently "assigned on loan" to a narcotics unit with HSI. (*Id.* 73:3-7, 83:8-84:8.) The contents of the package later tested positive for cocaine. (*Id.* 30:12-17.)

4

As law enforcement searched the vehicle, Special Agent Ragolia arrived on the scene. (*Id.* 33:17-19.) The initial search did not yield any additional evidence except for a torn receipt from a jewelry store dated January 23, 2023 inside the duffle bag. (*Id.* 33:4-15; ECF No. 30-1 at 3.) Law enforcement transported the vehicle to the HSI office in Newark, New Jersey, where another search of the vehicle revealed a hidden compartment, known as a "trap," beneath the car's front center console on the passenger side. (Tr. 33:23-34:25; ECF No. 58 at 24-27.) Inside the trap were six additional packages that were identical to the package recovered from the front passenger seat and later tested positive for cocaine; a black Taurus 9mm handgun loaded with twelve rounds; approximately $10,015.00 in cash (located in the trap and elsewhere throughout the vehicle); and the second half of the jewelry store receipt found in Rivera's duffle bag. (Tr. 33:8-37:24; ECF No. 30-1 at 3.) Agent Figueira testified that upon opening the trap, the compartment appeared very full, and that in his opinion the package they observed in plain view on the front passenger seat would not have fit into the trap. (Tr. 37:2-3, 64:11-16.) Law enforcement also seized six cell phones from the vehicle. (ECF No. 30-1 at 4.)

In support of his Motion to Suppress, Rivera submitted an affidavit attesting that "[a]t no point did [he] run any stop sign or turn without signaling" on February 8, 2023. (ECF No. 30-1 at 7-8.) When he was stopped, Rivera "asked why [he] had been pulled over" and "law enforcement stated that it was for a 'drug complaint.'" (*Id.*) Agent Figueira removed Rivera from his vehicle and placed his hands behind his back, at which time "law enforcement was already searching the vehicle without [Rivera's] consent." (*Id.*) Rivera subsequently refused to sign a written consent form and verbally stated that he did not give consent to search the vehicle. (*Id.*) Rivera denies giving anyone on the scene consent to search the vehicle. (*Id.*)

5

### B.       Procedural History

On February 9, 2023, Rivera was charged in a criminal complaint in the United States District Court, District of New Jersey for possession of a firearm by a convicted felon, distribution and possession with intent to distribute a controlled substance, and possession of a firearm in furtherance of a drug trafficking crime.  (ECF No. 1.)  Rivera moves to suppress all evidence stemming from the Government's search of Rivera's vehicle that occurred on February 8, 2023, contending that it was seized in violation of the protections against unreasonable searches and seizures afforded under the Fourth Amendment to the United States Constitution.  (ECF No. 30.)  The Government opposed.  (ECF No. 32.)  After the September 17, 2024 suppression hearing, the parties requested additional time to file supplement briefs in order to inspect the vehicle and attempt to corroborate Agent Figueira's opinion that the seventh package of narcotics would not have fit into the trap with the other evidence.  (ECF No. 58 at 5.)  However, when the parties met to inspect the evidence on October 23, 2024, they could not replicate the conditions of the packages as they were found on February 8, 2023.  (*Id.*)  The packages found in the trap were tightly packed into clear plastic "to the point of almost being vacuum-packed." (*Id.* at 5, 19.)  But after the Government tested the narcotics, they were repackaged into looser packaging, "making replication of the conditions on the night of Rivera's arrest impossible." (*Id.* at 5, 20-23.)  The parties filed their supplemental briefs between November 22 and December 6, 2024.  (ECF Nos. 57-59.)

## II.      DISCUSSION

### A.       Credibility Determinations

On a motion to suppress evidence, the trial court must assess the credibility of witnesses and may "accept or reject any or all of a witness's testimony." *United States v. Graham*, Crim. No. 13-00626, 2014 WL 3396495, at *4 (D.N.J. July 9, 2014) (citing *Gov't of the V.I. v. Gereau*,

502 F.2d 914, 921 (3d Cir. 1974)).  When assessing a witness's credibility, courts should consider "the witness's demeanor and manner on the stand; the witness's ability to accurately recollect the matters at hand; and the extent to which the testimony withstands a common-sense test of reason and logic." *United States v. Harris*, Crim. No. 20-00679, 2023 WL 5425395, at *4 (D.N.J. Aug. 23, 2023).  A witness should not be considered any more or less credible solely because the witness is a law enforcement officer.  *See Graham*, 2014 WL 3396495, at *4 (citing *United States. v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995)).

Here, both Agent Figueira and TFO Wronski testified at the suppression hearing.  Having had the opportunity to observe their demeanor during questioning, the Court finds both law enforcement officers credible.  The officers' testimony was coherent, plausible, and consistent with the evidence presented at the hearing and with the report published shortly after the incident. (*See* ECF No. 30-1 at 1-4.)  TFO Wronski testified consistently with Agent Figueira's account despite being sequestered during the hearing, and despite not having authored any of the case's reports or discussing the case with the other officers involved in the arrest, which include at least two other law enforcement officers in addition to Agent Figueira and TFO Wronski.  (Tr. 87:17-18, 94:14-95:12.)  *See United States v. Hankerson*, Crim No. 21-418, 2021 WL 4810847, at *9 (D.N.J. Oct. 15, 2021) (finding a detective's testimony credible, in part, because the detective's "version of the events was reported contemporaneously with those events, and . . . remained consistent," and because if "his version was false, to maintain that falsehood would have required the cooperation of at least three other officers").

Rivera argues that the Court should not credit the officers' testimony that he committed the traffic infractions that led to his traffic stop because no "violations were captured on video, no specific locations of the infractions were offered, and no traffic tickets were issued." (ECF No. 30

7

at 12.) But at the suppression hearing, TFO Wronski identified the specific street corner and stop sign where he observed Rivera commit the infractions. (Tr. 75:9-78:1; Gov. Exs. 7 & 8.) Next, the officers' lack of body-worn cameras is explained by the Department of Justice's guidance in effect at the time of the arrest (dated June 7, 2021), which stated that body-worn cameras were required only during pre-planned arrests and warrant executions—not during routine surveillance. (ECF No. 30-1 at 9.) Finally, there are multiple reasons why law enforcement might conduct a traffic stop, including to issue a traffic ticket and to protect the public. Special Agent Ragolia's instruction to TFO Wronski to conduct a stop if Rivera committed traffic violations came on the heels of law enforcement's previous attempt to surveil Rivera two months earlier, when Rivera drove "in an erratic and evasive manner" and "put the safety of others on the road at risk." (ECF No. 58 at 3; Tr. 42:6-44:4.) And as both officers testified, their mission at the time was to conduct surveillance related to a narcotics investigation, not to enforce traffic laws. The fact that Rivera was never issued a traffic citation does not strain credulity. (Tr. 54:19-20, 84:1-87:1 (TFO Wronski's testimony that the unit he was attached to at the time "was a narcotics unit" and that he did not have access to the equipment to issue a traffic citation both on the scene and afterwards).)

Rivera further contends that even if the officers properly initiated the traffic stop, it is implausible that they smelled marijuana, received Rivera's verbal consent to search the vehicle, and observed a kilogram of narcotics in plain view. (ECF No. 30 at 13.) Rivera argues that no marijuana was ever found in the vehicle; Rivera refused to sign a consent-to-search form; and there were "multiple other locations in the car" where Rivera could have concealed the narcotics instead of leaving it on top of his duffle bag on the front passenger seat. (*Id.* at 10-13.) Thus, Rivera asserts that the officers likely fabricated these facts to establish probable cause to search the vehicle, and that their credibility is "significantly compromised." (*Id.* at 6-7.)

The officers' testimony, however, is not inherently implausible. Agent Figueira testified that based on his experience in drug enforcement, the smell of marijuana may linger in a car even after the marijuana is no longer physically present. (Tr. 70:6-12.) The absence of marijuana in the car does not necessarily contradict the officers' testimony that they smelled the drug.[4] Agent Figueira also testified that in his experience, it is not uncommon for someone to provide verbal consent to search but refuse to sign a form—a scenario that this Court and multiple others have encountered before.[5] Finally, the parties provided several photographs of the trap, including from a view looking into the trap showing some evidence packed into the compartment. (ECF No. 58 at 24-27; Gov. Exs. 5, 6.) The photos show that it was not unreasonable for Agent Figueira to opine that the additional package would not have fit in the trap with the rest of the evidence. For these reasons, the Court credits Agent Figueira's and TFO Wronski's testimony in full.

---

[4] *See, e.g.*, *United States v. Williams*, Crim. No. 17-246, 2023 WL 3407685, at *28 n.23 (W.D. Pa. May 12, 2023) (collecting cases finding that "[t]he fact that no evidence was introduced that marijuana, burnt or otherwise, was found in the vehicle or on [d]efendants' persons does not refute the officers' testimony" that they smelled marijuana (quoting *United States v. Brounson*, 2016 WL 4472983, at *9 (N.D. Ga. May 23, 2016), *report and recommendation adopted*, 2016 WL 4472971 (N.D. Ga. Aug. 23, 2016))); *United States v. Green*, 897 F.3d 173, 186 (3d Cir. 2018) (holding that an officer's testimony that he smelled marijuana in a vehicle but did not find the source of the odor supported a finding of reasonable suspicion and that the "absence of actual marijuana . . . mitigates, but does not eliminate, the probative value of this evidence").

[5] *See, e.g.*, *United States v. Ayinde*, 127 F. App'x 587, 589-90 (3d Cir. 2005) (finding that the district court did not clearly err when it credited law enforcement's testimony that the defendant verbally consented to a vehicle search but refused to sign a form over the defendant's testimony that he did not consent); *United States v. Palmer*, Crim. No. 22-00282, 2024 WL 3052096, at *1-2 (D.N.J. Jun. 18, 2024) (describing video footage of the defendant providing law enforcement with verbal consent to search his vehicle but refusing to sign a written consent form); *United States v. Goode*, Crim. Nos. 11-204-1, 11-204-2, 11-204-3, 2011 WL 6302553, at *3 (E.D. Pa. Dec. 16, 2011) (describing how the defendant provided verbal consent to search a vehicle but "drew a line at signing a written authorization for the police to search the car"). These other cases, of course, do not make it more likely that Rivera provided verbal consent in this matter. Rather, the Court refers to these cases to demonstrate why the officers' testimony in this matter does not necessarily defy "a common-sense test of reason and logic." *Harris*, 2023 WL 5425395, at *4.

## B. The Investigatory Stop and Search of the Vehicle

The Fourth Amendment to the United States Constitution protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (citations omitted).

Traffic stops are "reviewed under the investigatory framework first articulated in *Terry v. Ohio*," 392 U.S. 1 (1968). *Id.* Under *Terry*, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Id.* (quoting *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000)). "Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence,' and only a 'minimal level of objective justification' is necessary for a *Terry* stop." *Id.* (cleaned up) (first quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); and then *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Here, TFO Wronski possessed sufficient facts to support a finding of reasonable suspicion to conduct a traffic stop. TFO Wronski observed Rivera fail to come to a complete stop at the stop sign before turning right onto Passaic Avenue without using a turn signal.[6] "It is well-established that police officers may perform investigatory traffic stops based on reasonable suspicion that an 'individual has violated the traffic laws.'" *Hankerson*, 2021 WL 4810847, at *9 (quoting *Delfin-Colina*, 464 F.3d at 397). Whether TFO Wronski intended to issue a traffic citation is of no

---

[6] Failure to come to a complete stop at an intersection marked with a stop sign is a violation of N.J. Stat. Ann. § 39:4-144(a). Turning a vehicle at an intersection without giving an appropriate signal violates N.J. Stat. Ann. § 39:4-126.

10

consequence, because "the reasonable suspicion test does not depend on the 'subjective intentions' of the officers"—the question is whether a "reasonable, trained officer in that situation could articulate specific reasons justifying a stop." *Id.* (first quoting *United States v. Whren*, 517 U.S. 806, 813 (1996); and then *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003)) (internal quotations omitted). Rivera's traffic violations furnished the reasonable suspicion necessary for TFO Wronski to conduct the traffic stop. *Id.* at *10.

Because the traffic stop was lawful, the officers' plain-view observation of narcotics on Rivera's front passenger seat occurred from a lawful vantage point. *See id.* (citing *Texas v. Brown*, 460 U.S. 730, 739-40 (1983) (holding that an officer executing a lawful traffic stop permissibly seized narcotics in plain view on the front passenger seat)). And both officers testified that based on their years of training and experience in drug enforcement, the package wrapped in clear plastic on Rivera's front passenger seat appeared to contain narcotics, so the package's incriminating character was immediately apparent. *See id.* at *10-11 (citing *Brown*, 496 U.S. at 739-40 (holding that an officer was entitled to seize an opaque balloon located on a front passenger seat based on his experience that narcotics were frequently packaged in such a manner)). (Tr. 30:2-17, 80:9-12.)

The officers' observation of narcotics in plain view—together with their previous narcotics investigation into Rivera—provided them with probable cause to believe that the car contained contraband or evidence of illegal activity, so their follow-on search of the vehicle was permissible even after the car was brought under HSI's control. *See Maryland v. Dyson*, 527 U.S. 465, 465-467, (1999) (holding that a search of a vehicle is not unreasonable if based on facts that would justify the issuance of a warrant, even where a warrant has not actually been obtained and there are no separate exigent circumstances); *Florida v. Meyers*, 466 U.S. 380, 382 (1984) (holding that after police searched a vehicle and seized several items at the scene of the arrest, a second

warrantless search of the vehicle eight hours after it had been impounded was permissible); *United States v. Hudson*, 346 F. App'x 903, 905-06 (3d Cir. 2009) (holding that officers with experience in drug enforcement who observed baggies appearing to contain narcotics had probable cause to conduct a warrantless search of the passenger compartment of the vehicle).

Finally, the odor of "burnt marijuana emanating from the vehicle" also provided the officers with probable cause to search the vehicle independent of the narcotics in plain view. *See United States v. Ushery*, 400 F. App'x 674, 675-76 (3d Cir. 2010) (finding that officers who stood directly next to a vehicle and testified that they smelled the odor of burnt marijuana coming from the vehicle had established probable cause to search the vehicle, despite finding no marijuana after the search); *United States v. Jackson*, 682 F. App'x 86, 88 (3d Cir. 2017) (noting that "so long as the smell of marijuana can be particularized to a specific person or place, it is sufficient to establish probable cause").[7] (Tr. 28:14-19, 79:15-16.)

Because the law enforcement officers in this matter possessed probable cause to believe that Rivera's vehicle contained contraband and evidence of a crime, their search of the vehicle was permissible despite the absence of a warrant.

## III.   CONCLUSION

For the foregoing reasons, and other good cause shown, Rivera's Motion to Suppress the evidence seized on February 8, 2023 is **DENIED**. An appropriate Order follows.

Dated: December 16, 2024

                                                                      GEORGETTE CASTNER
                                                                      UNITED STATES DISTRICT JUDGE

---

[7]   The Court does not reach the issue of whether Rivera's verbal consent to search the vehicle was voluntary as a matter of law because law enforcement had probable cause to search the vehicle based on their plain view of narcotics and the odor of marijuana.